UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JOSEPH CAIAZZA, on his own behalf and
those similarly situated

                Plaintiff,

v.

CARMINE MARCENO, in his Official
Capacity as Sheriff of Lee County, Florida,

                Defendant.

Case No. 2:18-cv-00784-SPC-MRM

## DEFENDANT'S CASE DISPOSITIVE MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

COMES NOW CARMINE MARCENO, in his official capacity as the duly elected SHERIFF of LEE COUNTY, FLORIDA (the "Defendant" or "Sheriff's Office"), by and through undersigned counsel and pursuant to Rule 56(a), Federal Rules of Civil Procedure, Rule 3.01(a), Local Rules for the Middle District of Florida, and this Court's Case Management and Scheduling Order (D.E. 31), as amended (D.E. 44), hereby moves for summary judgment as to the affirmative claims filed by JOSEPH CAIAZZA (the "Plaintiff" or "Caiazza") under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 *et seq*. ("FLSA"). For the reasons set forth in this Case Dispositive Motion for Summary Judgment and Supporting Memorandum of Law ("Motion"), the claims of the Plaintiff do not warrant a trial, as there are no material facts in dispute, and the Plaintiff's asserted claims do not establish a violation of federal law.

## I.    INTRODUCTION

This litigation involves a wage claim for overtime compensation, wherein Caiazza asserts that he performed "off-the-clock" work while employed by the Sheriff's Office for which he was not fully compensated. (D.E. 17, ¶¶ 14-15).  While conceding that he was paid for all of his

reported work hours as reflected by his certified time sheets, Caiazza primarily asserts that he should have been allowed to record his "on call" waiting time as compensable working time under the FLSA. More specifically, Caiazza argues such "on call" waiting time is compensable because the restrictions imposed by the Sheriff's Office on his "on call" waiting activities precluded him from effectively pursing his personal pursuits.

For the reasons more fully articulated below, the Sheriff's Office submits that Plaintiff's principal contention fails as a matter of law since Caiazza was free to engage in and pursue personal endeavors while waiting "on-call."   To the extent Caiazza relies on his "on call" obligation to report to a call within sixty minutes of notification from a dispatcher, this Court recently rejected a similar claim brought by other deputies of the Sheriff's Office.   *Calderone v. Scott*, Case No. 2:14-519-FtM-PAM-CM, 2017 WL 5444190 at *4 (M.D.Fla. Feb. 27, 2017), *aff'd.*, 893 F.3d 1319, n. 7 (11th Cir. 2018) (rejecting plaintiffs claim that on-call waiting time should be compensable on ground that Sheriff's Office's deputies were required to report for duty within one hour of being called out, holding that the "Lee County Sheriff's Office on-call requirements are not the sort of requirements that convert on-call time into compensable time.").

As an implied retreating argument in the event this Court rejects his primary contention, Caiazza further contends that even if his "on call" waiting time was not compensable, he nevertheless worked and should be paid for hours in excess of his scheduled shifts - inclusive of times he was called out while "on call" - even though he did not report such unscheduled working time on his certified time sheets.  Under applicable case precedent, Caiazza's attempt to recover overtime for admittedly unreported hours worked also fails as a matter of law. As a Deputy Sheriff, Caiazza was required to accurately report his work hours under the Sheriff's Office's policies and procedures for the three-year period preceding the filing of his Complaint in this litigation (*i.e.*,

November 28, 2015 to November 27, 2018) (the "Relevant Period").  Such policies and procedures further mandated that absent an emergency, Caiazza was required to obtain his supervisor's approval to work overtime hours beyond his scheduled shifts, and when feasible, he was required to use flex time to balance out his work period's unscheduled work hours by reducing his scheduled shift (or shifts) with a comparable amount of flexed time.  Regularly instructed to use flex time by his supervisor to cover any unscheduled working time, the Sheriff's Office had every reason to rely on Caiazza's certified time sheets as being accurate and reliable, for purposes of preparing its payroll and compensating Caiazza for his work.   It did so, and as Caiazza concedes, he was paid for all reported hours worked as shown in such time sheets.

Therefore, assuming *arguendo* that he was not able to flex off unscheduled work hours as his retreating FLSA claim implies, Caiazza is estopped from effectively seeking to revise his time sheets through post-retirement litigation.  This is particularly true when, as here, neither his pleadings nor interrogatory responses to this Court and to Defendant ever identify or quantify the dates and times of the alleged additional unscheduled working time he now seeks to recover, and there is no evidence on this record which supports that the Sheriff's Office had any constructive knowledge that he was working, but not reporting, unscheduled additional hours.

## II.    DEFENDANT'S STATEMENT OF MATERIAL FACTS[1]

1.      Joseph Caiazza was employed as a Deputy First Class for the Sheriff's Office for the final three years of his employment, before voluntarily retiring effective June 30, 2018. (Caiazza 14:25 to 15:1-19; Ex. 1).[2]

---

[1] Unless indicated otherwise, all Statements of Material Facts as presented pertain to the Relevant Period of Caiazza's asserted FLSA claims in this litigation (*i.e.*, from November 27, 2018 to November 27, 2015).

[2] "Caiazza, __: __-__" refers to the transcript from the March 10, 2020 deposition of Joseph Caiazza, followed by the appropriate page and line designations. "Caiazza, Ex. __" refers to exhibits from that deposition, followed by the appropriate numerical designation.

2.      From October 2, 2013 until June 30, 2018, Joseph Caiazza was assigned to serve the citizens, residents and visitors to Lee County, Florida as a Resident Patrol Deputy on Captiva Island. (Caiazza 36:5-10). As a Resident Deputy on Captiva Island ("Captiva"), Caiazza was assigned to Gulf District Patrol Zones G2/G3 (Caiazza 34:17-22), consisting of 201 square miles. (Caiazza 23:7-19). Gulf District Patrol Zone G3 consists of the island residential communities of Captiva and Sanibel, and their surrounding waters. (Sawicki, ¶ 3),[3] while Gulf District Patrol Zone G2 is comprised of the upper islands of Useppa, North (or Upper) Captiva, Cabbage Key, Cayo Costa and Mondongo (collectively, the "Upper Islands") and their surrounding waters. Gulf District Patrol Zones G2/G3 maintain an office on Captiva, located at 14820 Captiva Drive, Captiva, Florida. At that office, the Sheriff's Office maintains employee notices such as the poster regarding federal law requiring the payment of minimum wage and overtime to nonexempt employees. (Sawicki, ¶ 3; Ex. 1).

3.      As a Resident Deputy on Captiva, Caiazza was furnished with a marked agency patrol vehicle to operate while on patrol, and he and the other resident deputies had access to operate a marked all-terrain vehicle ("ATV") on the beaches, a golf cart to use on Upper Captiva, and a marked patrol boat to operate on the water. (Caiazza 49:21-25 to 54:1-6).

4.      While a Resident Deputy on Captiva, Caiazza lived on Captiva in a condominium unit at South Seas Plantation leased by Lee County, Florida. (Caiazza 38:12-16). Caiazza stayed in this leased condominium without charge, as Lee County paid for the rent and for the unit's utilities, subject to a $250/month cap. (Caiazza 80:25 to 81:1-7).

---

[3] "Sawicki, ¶ __" refers to the June 30, 2020 affidavit of Lee County Sheriff's Office Lieutenant Michael Sawicki, followed by the appropriate numerical paragraph designation. "Sawicki, Ex. __" refers to exhibits from that affidavit, followed by the appropriate numerical designation.

5.     The other Resident Deputy on Captiva assigned to Gulf District Patrol Zones G2/G3 was Christopher Lusk. Lusk formally transferred to Gulf District Patrol Zones G2/G3 on November 24, 2015 (Lusk, ¶ 1),[4] as a replacement for Resident Deputy Ed Waite. (Sawicki, ¶ 4). Deputy Lusk also lived with his family and children on Captiva in a house leased by Lee County. Lee County paid the rent for this house and for the house's water and electricity, subject to a $250/month cap. (Sawicki, ¶ 4).

6.     Resident Deputies Caiazza and Lusk worked under the general supervision of Lieutenant Mike Sawicki, who was responsible for overseeing their work, managing their shift schedules, and performing their evaluations. As a former Captiva Resident Deputy himself for part of the period of September 15, 2008 until May 10, 2014, Sawicki lived during the Relevant Period with his family in a house on Sanibel leased by Lee County, Florida. (Sawicki, ¶ 4). Sawicki's Sanibel residence and utility expenses were also provided to him by Lee County, subject to the same monthly cap as Resident Deputy Lusk.

7.     Caiazza was employed on a 14-day work period, which is permissible under Section 7(k) of the FLSA. 29 U.S.C. § 207(k). Working this Section 7(k) schedule of 84 hours in a 14-day work period, Caiazza concedes that he was not entitled to be paid overtime compensation under the FLSA unless he worked in excess of 86 hours in his 14-day work period.[5] (Caiazza, Ex. 19, Response to Interrogatory 2).

8.     Sawicki regularly scheduled Resident Deputies Caiazza and Lusk to work an 84-hour tour of duty consisting generally of seven 12-hour shifts over fourteen consecutive calendar

---

[4] "Lusk, ¶ __" refers to the June 30, 2020 affidavit of Lee County Sheriff's Office Patrol Deputy Christopher Lusk, followed by the appropriate numerical paragraph designation. "Lusk, Ex. 1" refers to the composite exhibit referenced by Lusk's affidavit.

[5] Caiazza has not brought a breach of contract claim against the Sheriff's Office with respect to the gap time claim of working more than 84 hours but less than 86 hours in a work period.

days ("work period"), with each work period beginning on a Sunday and ending on a Saturday. (Sawicki, ¶ 5).[6]  However, the shift schedules for Resident Deputies Caiazza and Lusk would alternate, so that neither was scheduled to be on shift at the same date and time as the other. (Sawicki, Ex. 4). As experienced patrol deputies with the ability to operate independently and without Sawicki's close supervision, Sawicki afforded discretion to Caiazza and Lusk as to when to begin and end their scheduled shifts  (Sawicki, ¶ 5), and how best to patrol their assigned Patrol Zones (Caiazza 54:20-25 to 55:1-23).

9.      Generally, Caiazza worked from 10:00 a.m.to 10:00 p.m. on his assigned shifts. (Caiazza 26: 15-18). However, the actual shift schedules varied when Deputies Caiazza or Lusk were flexing off time worked beyond their scheduled shifts (Sawicki, ¶¶ 5 and 11), or if they were called out while "On Call." (Caiazza 26:15-25). Among other mandates, the formal job description requires deputy sheriffs to respond to dispatch-directed service calls in their assigned Patrol Zones, conduct active patrolling of their assigned Patrol Zones, and to thoroughly, accurately and timely complete all required reports consistent with agency policies (Sawicki, ¶ 4; Ex. 2). The job description further requires deputy sheriffs to have the ability to read, interpret and follow the Sheriff's Office's procedural and policy manuals related to their job. (Sawicki, ¶ 4; Ex. 2 at p. 8). Deputy Caiazza was familiar with the Sheriff's Office's policies regarding compensation and benefits. (Caiazza 56:9-2).

10.      As the supervisor for Gulf District Patrol Zones G2/G3, Sawicki worked a regular shift schedule consisting of eight 10.5-hour shifts, Tuesday through Friday of each work period, beginning at 8:00 a.m. or 8:30 a.m. (Sawicki, ¶ 7). As shown by an illustration of the regular shift

---

[6] Deputy Caiazza concedes that as a certified law enforcement officer, he was not ever employed by the Sheriff's Office on a seven-day workweek (Caiazza 105:20-25 to 106:1-23), as he attested was the case in his answers to the Court's FLSA interrogatories. (D.E. 23, Response to Interrogatory 7(a)).

schedules for those deputies in Gulf District Patrol Zones G2/G3 (Sawicki, Ex. 4), for each work period Deputies Caiazza and Lusk worked a scheduled shift covering part of the same shift as Lt. Sawicki on only three of their seven scheduled work shifts. This means that for four of their seven regular 12-hour shifts each work period, Resident Deputies Caiazza and Lusk were the only deputies patrolling Patrol Zones G2/G3.

11.     From November 27, 2015 through June 30, 2018, Resident Deputies Caiazza, Lusk and Sawicki were the only deputies regularly assigned shifts in Gulf District Patrol Zones G2/G3, with all three working different shift schedules on the same 14-day tours of duty. (Sawicki, ¶¶ 5, 7). When Deputy Caiazza's assigned shift overlapped with part of Lieutenant Sawicki's scheduled shift, they might interact once or twice a day. Other than such limited interactions, they would not typically observe one another as they carried out their shift's responsibilities. (Caiazza 48:14-25 to 49:1-7).

12.     Pursuant to Section 22.1.1.5 of the Sheriff's Office Operations Manual (later renumbered to Section 22.1.1.6), Resident Deputies Caiazza and Lusk were responsible for maintaining their own time sheets which were required to accurately capture the amount of hours worked each work period, as well as any approved leave they may have taken as allowed by the Sheriff's Policies. (Sawicki ¶ 6, Exc. 3). Resident Deputies Caiazza and Lusk were responsible for certifying the accuracy of their respective time sheets through their signatures or other acceptable authorizations before submitting them to Lieutenant Sawicki for approval and processing by the Sheriff's Office's Finance Department. (Sawicki, ¶ 6; Ex. 3). In April, 2018, the Sheriff's Office implemented automated Attendance Reports as a new tool to create records of hours worked,

replacing manually executed time sheets. (Caiazza Ex. 10).[7] Deputy Caiazza concedes that he was fully and properly paid for all "hours worked" that he reported on his certified or authorized time sheets during the Relevant Period. (Caiazza 78:10-25 to 79:1-8).[8]

13.    As Resident Deputies in Patrol Zones G2/G3 working independently from direct visual supervision by Lieutenant Sawicki, Deputies Lusk and Caiazza were compensated for hours worked each work period based upon what work hours they each reported on their time sheets or on their Attendance Reports. (Caiazza 79:5-8). Through his pending claim, Deputy Caiazza does not assert that the Sheriff's Office ever failed to compensate him for his reported work hours as reflected on his certified time sheets. (D.E. 23, response to Interrogatory #6). Instead, he asserts that he frequently worked more than 86 hours in his work periods (Caiazza, Ex. 19, Response to Interrogatory #2), conceding that he never reported the additional hours he now claims to have worked on his certified or authorized time sheets.

14.    In addition to working regularly scheduled shifts, Patrol Deputies Caiazza and Lusk were also responsible for periods of on call service in Gulf District Patrol Zones G2/G3. Each Resident Deputy generally was scheduled to be "on call" for the 12-hour period following completion of his regularly scheduled shifts, and for two additional days of "On Call" service each work period. (Sawicki, ¶ 8).

15.    While the mere status of waiting while being on call did not implicate compensable working time under the Sheriff's Office's Operations Manual, the Sheriff's Office did compensate Deputies Caiazza and Lusk for time spent responding to a call out while "on call," and such call

---

[7] Since Attendance Reports and time sheets served the same function, Attendance Reports and manually signed time sheets are hereinafter referred to as "time sheets."

[8] As explained further below, Caiazza's contention is that he should have been allowed to report on call waiting time as compensable hours worked under the FLSA. To be clear, Caiazza was not allowed to report waiting time while "on call" as "hours worked."

outs were supposed to have been recorded by the Patrol Deputies on their time sheets if they were not able to flex off the additional working time by shortening a comparable period of an assigned shift. (Sawicki, ¶ 8). The Sheriff's Office policy states:

> **Compensatory time is time off given to non-exempt members in exchange for extra hours worked during a work period. All extra hours worked by non-exempt personnel shall be reimbursed, whenever possible, through time off during the same work period, at a rate of one hour off for each extra hour worked.** … **Members are to record all hours worked on the time sheet under the "hours worked" column. Any hours worked in excess of … 84 during the pay period for certified will be paid for at one and one half times their hourly rate of pay**.

(Caiazza, Ex. 5, Section 22.1.1-e) (emphasis supplied).

16.     The general practice of the Sheriff's Office was that on-call deputies were required to be able to show up and prepared for duty at a designated location within their assigned patrol zones within 60-minutes of being called out. Due to this temporal restriction and as applied to Resident Deputies Caiazza and Lusk,  this meant that while designated to be "on call," the Resident Deputy generally did not leave the islands of Captiva and Sanibel (and their surrounding waters), and the Resident Deputy could not consume alcoholic beverages. (Caiazza 91:14-25 to 92:1-20). Other than abiding by these two "on-call" restrictions, the Resident Deputies could spend their on-call assignment time pursuing whatever personal endeavors they chose. (Sawicki, ¶ 9). Deputy Caiazza claims that while "on call" he was subject to being called out, and thus was not guaranteed the opportunity to watch a television show without be potentially being interrupted (Caiazza 124:5-7), cook a meal without having to shut the grill down (Caiazza 125:9-12), have a beer when he wanted to have one (Caiazza 124:12-13), or go shopping or to a movie on the mainland. (Caiazza, Ex. 13 at p. 3; Caiazza 91:11-25 to 92:1-11).

17.     However, while serving his "on-call" assignments, Resident Deputy Lusk was able to read, watch television or movies at his home, cook and have meals, entertain guests in his island

residence, visit friends, go to and eat meals at restaurants, go shopping, play with his children, fish (from or near the islands), exercise or sleep. (Lusk, ¶ 9). The Sheriff's Office had no policy requiring that Resident Deputies monitor their agency-issued computers while "on-call," and no supervisor ever instructed Lusk to do so. (Lusk, ¶ 10). However, while "on call," Deputy Caiazza elected to check his computer constantly (Caiazza 125:6-8), so he could see potential calls from dispatch before the dispatcher called him on his cell phone. (Caiazza 61:4-25).

18.     When needing to respond to a dispatched call out while "on-call," Deputies Lusk and Caiazza would be notified of the service call by being contacted by dispatch through their agency issued cellular phones, since their radios were being charged and not available for them to use. (Lusk, ¶ 10; Caiazza 125:2-7). When there were times he needed to silence his cellular phone while "On-Call" (such as while attending an event where he and others in attendance could not be interrupted), Resident Deputy Lusk would notify Lieutenant Sawicki or Deputy Caiazza to let one of them know about temporarily being unreachable, and one of them would spot cover the "on-call" assignment for that period of time. (Lusk, ¶ 11).

19.     The Sheriff's Office's Overtime Policy for Non-Exempt Personnel (Caiazza, Ex. 5, Section 22.1.1-f), provides that no non-emergency overtime hours are allowed to be worked unless approved by the agency member's supervisor, and additional hours beyond scheduled shifts are typically reimbursed, whenever possible through time off during the same work period, at a rate of one hour off for each additional hour worked. (Sawicki, ¶ 10). Consistent with this policy, Lieutenant Sawicki regularly instructed Deputies Caiazza and Lusk to flex off any time worked associated with extended shift schedules and/or responses to call outs by requesting that they adjust or balance out their subsequent shifts with a comparable amount of work hours when it was operationally feasible for them to do so within the same work period. (Sawicki, ¶ 11). When able

10

to do so, the Resident Deputy would work less of his regularly scheduled shift(s), so that by the end of the work period his total hours worked for the work period would be the regularly scheduled 84-hour tour of duty.

20.    Both Resident Deputies Caiazza and Lusk flexed off their additional work time as the Sheriff's Office's policy and Lieutenant Sawicki encouraged them to do. (Sawicki, ¶ 12, Exs. 5 and 6; Lusk, ¶ 7, Ex. 1 (work period ending January 27, 2018)). Deputy Caiazza recognized the flex time policy as mandated by the Sheriff's Office, but asserts it didn't work for him as a Resident Deputy since any time he flexed off he'd still be "on call," contending that waiting time while "on call" should have been treated as compensable time. (Caiazza 67:2-8; 69:9-23; 72:13-20). However, when there were work periods in which Resident Deputies Caiazza and Lusk were not able to flex off their additional work hours, including but not limited to when both were required to work extensive additional hours associated with the impact of Hurricane Irma in September, 2017 (Sawicki Ex. 5 – (Caiazza work period ending September 23, 2017); Lusk, ¶ 6, Ex. 1 (Lusk work periods ending June 17, September 9, and September 23, 2017)), they were paid for their reported and approved overtime. Lieutenant Sawicki did not ever disapprove reported overtime for the period he supervised Resident Deputy Caiazza's work in Gulf District Patrol Zones G2/G3. (Sawicki, ¶ 13).

21.    Contrary to the "Total Hours" that he represented he worked on his certified or authorized time sheets that he submitted to Lieutenant Sawicki each work period, Resident Deputy Caiazza asserts that all of the time he was assigned to be "on-call" should have been counted by the Sheriff's Office as compensable working time under the FLSA. (Caiazza 60:12-18; 62:24-25 to 63:1-8; D.E. 23, Response to Court Interrogatory #7; Caiazza Ex. 13).

11

22.     Under the contentions that all "on call" waiting time should be compensable and that the concept of "flexing off" extra shift and call out hours didn't work (Caiazza 93:24-25 to 94:1-3), that for most of his work periods, he worked a total of 192 hours, of which 108 hours should be paid as overtime compensation   (D.E. 23, Response to Court Interrogatory #7(e); Caiazza Ex. 19, Response to Interrogatory 2)). Under these contentions, Caiazza asserts that he is entitled to $611,752.56 in damages, costs and attorney's fees. (D.E. 23, Response to Court Interrogatory 7(e); Caiazza Ex. 18, ¶ 3).

## III.   MEMORANDUM OF LAW

### a.     Plaintiff's claims for compensation for "on call" waiting time seek compensation for time that is not compensable working time under the FLSA as a matter of law.

Caiazza contends in this lawsuit that he should be compensated for time spent being on "on call" status and waiting to respond to a call for duty. For the reasons noted below, the FLSA does not render such time to be compensable, and therefore, the Sheriff's Office is entitled to summary judgment as a matter of law on these claims. *Calderone v. Scott*, Case No. 2:14-519-FtM-PAM-CM, 2017 WL 5444190 at *4 (M.D.Fla. Feb. 27, 2017), *aff'd.*, 893 F.3d 1319, n. 7 (11th Cir. 2018) (rejecting plaintiffs claim that on-call waiting time should be compensable on ground that Sheriff's Office's deputies were required to report for duty within one hour of being called out).

It is well established under the FLSA that where employees are "engaged to wait" for an employer's call to duty, the employees may be entitled to compensation for their time. *Skidmore v. Swift & Co.*, 323 U.S. 134, 136, 65 S.Ct. 161, 163, 89 L.Ed. 124 (1944). However, the distinction as to whether an employee is "engaged to wait" or "waiting to be engaged" hinges on whether the time spent waiting can be used primarily for the benefit of the employee or for the benefit of the employer. *Armour & Co. v. Wantock*, 323 U.S. 126, 133, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944).

To alleviate confusion regarding characterizing on-call time, the Department of Labor's public sector regulations regarding on-call waiting time provide, in relevant part:

> (d) An employee who is not required to remain on the employer's premises but is merely required to leave word at home or with company officials where he or she may be reached is not working while on call. …. Where, for example, an employee in fire protection activities has returned home after the shift, with the understanding that he or she is expected to return to work in the event of an emergency in the night, such time spent at home is normally not compensable.

29 C.F.R. § 553.221(d). *See also*, *generally*, 29 C.F.R. § 785.17.

In *Birdwell v. City of Gadsden, Alabama*, the Eleventh Circuit considered whether detectives who were placed on-call during their off-duty time to possibly fill in for striking city employees should be compensated under the FLSA. 970 F.2d 802, 808 (11th Cir. 1992). The Court analyzed the detective's claims, and held that to be compensable, an employee's on-call time must be so "*severely restricted*" that the employee is unable to engage in personal pursuits while on call, or cannot otherwise effectively use the on-call time for the employee's own benefit. (emphasis added). *Id.* at 809-810.

In *Birdwell*, the detectives were required to leave a forwarding number or own a beeper where they could be reached while "on-call," which the plaintiffs allege limited activities such as fishing or hunting for those detectives who did own a beeper. *Id.* at 808. In addition, the detectives had to bring two cars to outings in case they were called back to work, they could not use compensatory time or vacation time, and they were prohibited from consuming alcohol. *Id.* Otherwise, the detectives were permitted to use their home time in any manner they wished, so long as they provided the necessary contact information and otherwise abided by the stated restrictions. *Id.* The Eleventh Circuit found that these restrictions were not enough to render the detectives' on-call waiting time as compensable under the FLSA, and in doing so, considered with approval, comparator cases from other circuits.

13

Specifically, the *Birdwell* court considered the Fifth Circuit's decision in *Bright v. Houston Northwest Medical Center Survivor, Inc.*, 934 F.2d 671 (5th Cir. 1991). In *Bright*, the plaintiff, a biomedical equipment repair technician, was on-call through the entirety of his time off-duty. *Id.* at 672. While on-call, Bright was not permitted to drink alcohol, had to be available to be reached by beeper, and was required to arrive at his employer's address within twenty minutes after receiving a call for duty. *Id.* This off-duty on-call assignment lasted for the entirety of Bright's eleven months of employment, and consequently, Bright could not take vacation time, nor could he take any days off. *Id.* While noting that Bright's job was unpleasant and arguably oppressive, the Fifth Circuit held that the on-call requirements were not so strenuous as to make Bright's on-call time compensable. *Id.* at 679. Notably, and despite his restrictions, the Court found it significant that Bright was able to carry out his normal personal activities within his own home, and could also engage in "normal shopping, eating at restaurants, and the like, as he chose." *Id.* at 676.

The *Birdwell* court also analyzed the Fifth Circuit's decision in *Halferty v. Pulse Drug Co., Inc.*, where the plaintiff was required to remain in her home for a three-hour period, five nights a week, and be available for telephone calls as an ambulance dispatcher. 864 F.2d 1185, 1185-1187 (5th Cir. 1989). When determining whether Halferty could "use the time effectively for [her] own purposes," the court found that she could visit friends, entertain guests, sleep, watch television, do laundry, and babysit. *Id.* at 1189. Moreover, the Court found it significant that Halferty could leave her home if she coordinated with another employee to answer the calls for her, or she had the calls forwarded. *Id.* Accordingly, the Fifth Circuit held that Halferty could effectively use her on call time for her own purposes and to pursue personal endeavors, and therefore, she was not entitled to any additional compensation. *Id.* at 1190.

14

Finally, the *Birdwell* court analyzed Tenth Circuit cases which presented even greater factual restrictions on the waiting time spent on-call by certain employees. In one of these cases, van drivers waiting in "on call" status were required to remain near the company's premises in case they received a call for service to transport railroad workers to and from their trains. *Norton v. Worthen Van Service, Inc.,* 839 F.2d 653, 654 (10th Cir. 1988). The drivers were required to wait 8-10 hours for calls and were disciplined for failing to respond to a call for service within twenty minutes of receiving the call. *Id.* at 654-55. Despite these restrictions, the Court rejected the driver's FLSA claims, finding that the van drivers could nevertheless pursue their own personal hobbies and run errands during their on call waiting time, citing evidence which confirmed the drivers used their wait time to visit the homes of friends, go to church, use laundromats, eat at restaurants, visit pool halls and local gymnasiums. The Court further noted that by purchasing pagers, the employer expanded its van driver's ability to freely use their on-call time because they were no longer required to remain near a phone. *Id.* at 655-56.

*Birdwell's* holding defeats Caiazza's wait time claim here. Under the undisputed facts and throughout the Relevant Period, Caiazza was, scheduled to work a tour of duty consisting of seven 12-hour shifts in each of his fourteen-day work periods. As a Resident Deputy in Gulf District Patrol Zones G2/G3, Caiazza lived in a condominium on Captiva leased by Lee County, Florida, and Lee County also paid for Caiazza's utilities at this residence. (Caiazza, 38: 12-19).

While "on call," Caiazza could not consume alcoholic beverages and if called out to an emergency, Caiazza generally was required to arrive at the designated address in Gulf District Patrol Zones G2/G3 within one hour of receiving the call. (Sawicki, ¶ 9). Due to the unique geographical boundaries of Gulf District Patrol Zones G2/G3, this response time necessitated the general practice that while "on-call," resident deputies had to maintain their presence on the islands

themselves or on the surrounding waters of either Captiva or Sanibel, to be able to timely respond if called out by dispatch. (Sawicki, ¶ 9; Caiazza 91:14-25 to 92:1-20). However, aside from the requirements of responding to a call out in this time constraint and reporting for duty without evidence of having consumed alcohol, Caiazza was free to engage in whatever personal activities he wished to pursue during his "on call" waiting time. (Sawicki, ¶ 9). In fact, the resident deputies routinely engaged in a variety of personal activities, including but not limited to watching television or movies at home, cooking and preparing meals, entertaining guests at their residences, visiting friends who lived on Captiva and Sanibel, going to and eating meals at restaurants on the islands, going shopping, spending time with their families, exercising and sleeping. (Lusk, ¶ 9).

Accordingly, the practical implication of the temporal restriction imposed by the one-hour response time did not impose any greater restrictions to engage in a range of personal activities as did the Sheriff's Office on call policy reviewed by the Court in *Calderone*.

> …., the Sheriff only requires that on-call deputies be available to report to work within an hour. (Lee Dep. at 21 ("I would have to be able to respond to the jail within an hour. Which meant that I had to carry my department phone with me.").) There are no other restrictions on a deputy's personal activities while on call.
>
> The regulations unequivocally establish that this sort of on-call time is not compensable.

*Calderone v. Scott*, 2017 WL 5444190 at *4. Courts have consistently found that idle on-call time such as that of the Sheriff's Office is predominantly for the employee's benefit, notwithstanding response times significantly less than the sixty-minute response time obligation imposed upon Caiazza. *See Reimer v. Champion Healthcare Corp.*, 258 F.3d 720, 724 (8th Cir. 2001) (twenty minutes); *Andrews v. Town of Skiatook, Okla.*, 123 F.3d 1327, 1330 (10th Cir. 1997) (five to ten minutes); *Norton v. Worthen Van Service., Inc.*, 839 F.2d at 654 (fifteen to twenty minutes).

Moreover, it was not uncommon for the residential deputies to spot cover each other's on-call duty assignments. (Lusk, ¶ 11). Specifically, if the residential deputy assigned to be "on call" had a commitment that required him to be unavailable during a portion of his on-call assignment, that residential deputy would simply notify another residential deputy in Patrol Zone G2/G3, who would then cover the on-call duty for that temporary period of time that the assigned deputy was unavailable. (Lusk, ¶ 11). This practice of "spot coverage" was common among the three residential deputies, and each deputy, including Caiazza, routinely utilized such "spot coverage." (Lusk, ¶ 11). Courts have routinely noted that affording employees' substantial flexibility in managing on-call schedules alleviates the restrictiveness imposed by requiring an employee to serve in an "on call" status away from the employer's premises. *See Taunton v. Genpak, LLC*, 762 F.Supp.2d 1338, 1350 (M.D. Ala. 2010) (an employee's flexibility to request and easily obtain trades for on-call duty assignments weighed in favor of the employer when determining whether the employee could effectively use on-call waiting time for the employee's own benefit.); *see also Lurvey v. Metro Dade Cnty.*, 870 F.Supp. 1570, 1581 (S.D. Fla. 1994) (when employees are able to trade on call time, "curtailment of personal activities may be somewhat alleviated.").

Applying these legal principles to the facts of this litigation, Caiazza's claim that he should be compensated for the entirety of his "on call" waiting time presents no viable FLSA claim. During his "on call" assignments, Caiazza was precluded from consuming alcohol and was required to respond to a call for duty within one-hour of receiving the call. While the practical implications of the response time requirement necessitated that he remain on or about Captiva and Sanibel or their surrounding waters, these two limitations did not impede the Plaintiff's ability to pursue his own personal endeavors while "on call." Furthermore, Caiazza was permitted full flexibility to trade and obtain "spot coverage" for on-call shift time between himself and the other

17

residential deputies, as a method to further accommodate his off-duty personal pursuits. Accordingly, such limited restrictions on Caiazza's personal time does not convert off-duty on-call waiting time to compensable working time, as these limited restrictions did not prevent Caiazza from using his waiting time for his own personal pursuits. *Ingram v. County of Bucks*, 144 F.3d 265 (3d Cir. 1998); *Calderone v. Scott*, 2017 WL 544190 at \*4.

      **b.**    **Plaintiff's claims for "call outs" seek compensation for time that he failed to report to the Sheriff's Office as "hours worked" on his certified time sheets.**

Caiazza also now asserts that part of his time spent "on call" should be compensable working time under the FLSA, contending that he occasionally was engaged in law enforcement activities beyond his scheduled shifts and/or when called out to respond to a dispatched service call, but never reported such alleged extra working time on his certified time sheets. Assuming *arguendo* that this occurred, this Court should not countenance Caiazza "call outs" overtime claim, when such a claim is predicated upon Caiazza's failure to accurately report his "hours worked" as required by Sheriff's Office policy. Here, Caiazza admittedly did not report such alleged additional working time on his time sheets as required by policy, Caiazza did not seek his supervisor's approval to work more than his 84-hour tour of duty as required by policy, Caiazza necessarily failed to flex off his time as required by policy and as directed by his supervisor, and Caiazza failed to identify or quantify this alleged "call out" time claim in his Amended Complaint (D.E. 17), in his Initial Disclosures (Caiazza, Ex. 18), or as a basis of an asserted overtime claim in responding to sworn interrogatories (Caiazza, Ex. 19, Response to Interrogatory #3).

Defendant's Operations Manual makes explicitly clear that it is the policy of the Sheriff's Office that all nonexempt members of the agency submit a time sheet that accurately reflects all hours worked, all hours taken as sick, personal or vacation time, and all court time hours. (Sawicki, ¶ 6; Ex. 3). It is the sole responsibility of each individual deputy to fully complete, submit, and

18

certify a time sheet, and to further review payment calculations to ensure accuracy. (Sawicki, ¶ 6; Ex. 3). The Operations Manual further directs that absent an emergency, no full-time, non-exempt personnel shall work overtime hours without the prior express approval by the member's immediate supervisor. (Caiazza Ex. 5, Section 22.1.1-f).

Caiazza, through his own admission, acknowledges the existence of the Sheriff's Office's policy requiring the truthful and accurate recording of hours worked on his certified time sheets. (Caiazza 67:22-25 to 68:1-13). Caiazza further concedes that he generally did not report on his time sheets any of the call out time that he now seeks to recover as supplemental compensable working time during the Relevant Period. (Caiazza 73:23-25 to 74:1-18). When Defendant sought to have Caiazza quantify the call out times for which he was seeking compensation in this litigation, he refused to do so (Caiazza Ex. 19, response to Interrogatory #3), instead asserting a deflecting objection and relying on his claim that all "on call" time should have been counted as compensable hours worked.

Notably, courts confronted with FLSA claims based upon the alleged underpayment of wages due have made clear that claimants charged with the responsibility of completing their own time cards cannot benefit from unpaid overtime claims unless they can affirmatively establish that the employer knew or should have known of the unreported overtime work. *Allen v. Board of Public Education for Bibb County*, 495 F.3d 1306, 1314-15 (11th Cir. 2007). Knowledge of unpaid overtime may be imputed to the employer when its supervisors or management actively encouraged artificially low reporting. *Id*. at 1319; *see also Bailey v. TitleMax of Georgia, Inc.*, 776 F.3d 797, 801 (11th Cir. 2015) (finding knowledge of unpaid overtime was imputed to employer because supervisor "both encouraged artificially low reporting and squelched truthful timekeeping.").

The Fifth Circuit was presented with facts quite analogous to those of this case in *Newton v. City of Henderson*, 47 F.3d 746 (5th Cir. 1995). In *Newton*, the employer had an established personnel policy requiring all employees to "obtain approval prior to working overtime" and to accurately report any overtime worked on a specified payroll form. *Id.* at 747-48. Stephen Newton, a former City of Henderson, Texas police officer was required to read and sign an acknowledgement of the city's overtime policy. *Id.* Pursuant to the city's policy, Newton was compensated for all overtime hours he reported on the required payroll forms, but following his resignation from the City, Newton asserted a claim for unpaid overtime for unreported hours he allegedly worked as part of a drug task force. *Id.* at 748. Newton argued that the city had constructive knowledge of his overtime hours because he made "report[s] [of] his activities" to his supervisors on a regular basis, together with the Chief of Police's knowledge regarding Newton's assignment to the drug task force. *Id.* The Court held this evidence was insufficient for purposes of imputing constructive knowledge of Newton's unreported overtime work to the city, emphasizing that the city had an express policy prohibiting overtime without prior approval, and Newton knew of, and deliberately ignored, the procedures for reporting his overtime. *Id.* at 749.

Notably, the Fifth Circuit stated that to hold the city liable for Newton's asserted unpaid overtime based solely on the fact that Newton's supervisors had the ability to investigate whether Newton was truthfully completing his payroll forms, would essentially be stating that the city did not have the right to require an employee to adhere to its well-established procedures for claiming overtime. *Id.* Moreover, the court found it reasonable for Newton's supervisors to assume that Newton was taking flex-time to compensate for unscheduled hours worked, and that his payroll submissions were a reliable indicator of his working time, as Newton did not present any evidence to support that the city encouraged or forced Newton to submit incorrect time sheets. *Id.* at 749-

50. *See also, White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869 (6th Cir. 2012) (refusing to impute constructive knowledge of unpaid overtime to an employer in the absence of evidence that the employer proactively altered time records or encouraged inaccurate reporting by the employee).

Similar to *Newton*, the material facts of this case demonstrate there was no supervisory encouragement to inaccurately report hours worked, and no supervisor of the Sheriff's Office ever told Caiazza not to report compensable hours worked, particularly when as here, such an instruction would have been contrary to the explicit provisions of the Defendant's Operations Manual (Sawicki, Ex. 3), and such a direction – if given and carried out -  would have been a violation of the deputy sheriff's formal job description's requirement to accurately and completely submit required reports (Sawicki, Ex. 2 at p. 2). After all, the time sheet forms for the work periods ending December 5, 2015 through April 21, 2018 specifically stated, in relevant part:

> I HEREBY CERTIFY THAT THE ABOVE HOURS INDICATED ARE TRUE AND ACCURATE. I HAVE INCLUDED ALL HOURS WORKED DURING THE PAY PERIOD & NO HOURS HAVE BEEN OMITTED.

(Caiazza, Ex. 9).[9]

In addition to its overtime compensation policy, the Sheriff's Office also maintained a flex time policy, whereby nonexempt deputy sheriffs were encouraged to balance their extra work hours caused by extended shifts and call outs by shortening scheduled shifts later in their work periods when they operationally were able to do so. Generally referred to as "flex time," it was common for supervisory members of the agency to remind deputies of this policy, thereby encouraging the submission of an 84-hour time sheet when it was operationally feasible to flex off law enforcement activities which had occurred outside of their regular tours of duty. (Caiazza, Ex.

---

[9] The form further denies "Hours Worked" as including "ALL hours on the job." (Caiazza, Ex. 9, n. 1).

5, Section 22.1.1-e). Notably, when flex time was not able to be used, the Sheriff's Office's overtime policy further directed that the deputy sheriff report the extra hours through an overtime authorization slip, for his supervisor's review and approval. (Caiazza, Ex. 5, Section 22.1.1-f). This protocol confirms the intent of the Sheriff's Office's compensation policy for nonexempt deputy sheriffs such as Deputy Caiazza:  Flex off your time when you can, and if you cannot, submit an authorization slip to your supervisor so that the supervisor is thereby made aware of the additional work time and with approval, the additional work time can be properly paid.

While a Resident Deputy himself, Sawicki had been instructed to use flex time by his then-supervisor, Lieutenant Poppalardo (who was later promoted to Captain). Sawicki recalls Poppalardo encouraging the use of flex time by at times explaining that he would prefer to see time sheets limited to then Deputy Sawicki's regular 84-hour shift schedule. (Sawicki, ¶ 10). When he later became a supervisor, Lieutenant Sawicki therefore regularly instructed Deputies Caiazza and Lusk to flex off extra time worked associated with extended shift schedules and call outs by adjusting their subsequent scheduled shifts for less work hours when it was operationally feasible for them to do so within the same work period. (Sawicki, ¶ 11). Caiazza repeatedly assured Lieutenant Sawicki that he was doing so (Sawicki, ¶ 15), and Caiazza in fact did so. (Sawicki ¶ 12, Ex. 5 and 6). Resident Deputy Lusk also regularly used flex time as directed by Sawicki and agency policy. (Lusk, ¶ 7; Ex. 1 (work periods ending 01/27/18, 05/05.18, 05/19/18, 06/02/18. 06/16/18 and 06/30/18).

Further, when it was not operationally feasible to flex off the call out time within the same work period, Caiazza was required to write the call out time on his certified time sheet as hours worked, and if such call out time resulted in exceeding 84-hours worked for the work period, Caiazza was required to submit an overtime authorization slip, which was reviewed and approved

by Lieutenant Sawicki. (Sawicki, ¶ 11). The same protocol on reporting "call out time" applied equally to Deputy Lusk. (Lusk, ¶¶ 3, 6). When they followed this agency protocol, both Resident Deputies Caiazza and Lusk received overtime compensation for such hours worked in excess of their assigned tours of duty.

Here, Sawicki had no constructive knowledge of Caiazza's unreported call outs which led to working time beyond the reported "hours worked." Due to the geographical scope of Gulf District Patrol Zones G2/G3 and their respective shift schedules, Lieutenant Sawicki and Deputy Lusk or Deputy Caiazza routinely patrolled different areas of their assigned Patrol Zones at different times throughout their scheduled shifts, which resulted in limited in-person contact with one another. (Caiazza 48:14-25 to 49:1-7). Moreover, based on Caiazza's previous work experience and ability to operate independently and without close supervision, Lieutenant Sawicki afforded Caiazza significant discretion on when to start and stop his designated shifts, provided Caiazza generally provide 12 hours of patrol throughout Gulf District Patrol Zones G2/G3. (Sawicki, ¶ 5).

Therefore, it was Lieutenant Sawicki's reasonable expectation that the working hours on Caiazza's certified time sheets reflected an accurate and truthful representation of Caiazza's actual hours worked, including extended shifts and all call outs. (Sawicki, ¶¶ 13-14). In reviewing Caiazza's time sheets, Lieutenant Sawicki never altered any of the work hours attested to by Caiazza, nor did he double check Caiazza's certified or authorized time sheets against agency call detail reports, or for alterations in his regularly scheduled shifts. (Sawicki, ¶ 14). Accordingly, when reviewing and approving Caiazza's certified time sheets, Lieutenant Sawicki accepted the total working hours as reported by Caiazza, and concluded that unless overtime was sought through an appropriate authorization slip such as on an illustrative work period ending August 12, 2017

23

(Sawicki Ex. 5 at Bates pages DEF000035 and DEF000037), Caiazza was properly flexing off his additional shifts and/or call out time as he had been instructed to do.

There is no FLSA violation generated by a public sector employer's policy, direction or encouragement to nonexempt law enforcement personnel – when feasible – to balance their hours or "flex time" within a single work period, so as to minimize or eliminate unnecessary overtime pay liability that would otherwise be incurred. *See generally Christensen v. Harris County*, 529 U.S. 576, 585, 120 S.Ct. 1655, 1662, 146 L.Ed.2d 621 (2000) (recognizing that under the FLSA, an employer has the authority to limit the number of hours a non-exempt employee can work). As applied here, the FLSA's overtime pay obligation is not implicated until Caiazza actually worked more than 86 hours in a single work period, and Defendant's Operations Manual makes clear that non-emergency deviations for additional work beyond the regularly scheduled shifts are not authorized without consent from the nonexempt employee's immediate supervisor. (Caiazza, Ex. 5 at Section 22.1.1-f).

Consequently, Caiazza cannot violate the Sheriff's Office's policies requiring that he accurately report all hours worked and get "express approval" from is supervisor for additional work by now claiming that he repeatedly underreported his work hours on his own certified or authorized time sheets. *Newton v. City of Henderson*, 47 F.3d at 749-50 ("Since it was reasonable for [his supervisors] to assume that Newton was taking flex time to compensate for unscheduled hours worked, it was reasonable for [Newton's supervisors] to rely on Newton's payroll submissions as a reliable indicator of the number of hours worked by Newton."  This Court should not countenance Caiazza's efforts to maneuver around his obligations to truthfully and accurately report his hours worked while he was employed as a Resident Deputy – obligations that are detailed throughout the Defendant's Operations Manual, conspicuously stated on the time sheets

24

themselves, and which were a routine topic of direction from Lieutenant Sawicki, his immediate supervisor. (Sawicki, ¶ 15).

Here, Caiazza was aware of his obligations to accurately and truthfully report his working hours, and he was instructed by his immediate supervisor to flex time off of subsequently scheduled shifts and call outs when operationally feasible, to reduce the occurrence of overtime. Under *Newton*, Caiazza cannot underreport his working time, and after voluntarily resigning from the agency, seek to revise all of his previously certified or authorized time sheets for the prior three years to try and gain a windfall in wage payments.

## IV.   <u>CONCLUSION</u>

For the reasons noted above, the Sheriff's Office is entitled to judgment as a matter of law on Caiazza's asserted claim for violation of the FLSA's overtime requirements. Accordingly, Defendant respectfully requests that the Court grant its Motion for Summary Judgment and enter judgment in favor of the Sheriff's Office.

Dated this 2nd day of July 2020.                Respectfully submitted,

*s/ David Stefany*
DAVID J. STEFANY
Florida Bar No. 438995
MATTHEW D. STEFANY
Florida Bar No. 98790
MAELYN M. MORRISON
Florida Bar No. 1018654
*Counsel for Defendant*

**ALLEN NORTON & BLUE, P.A.**
Hyde Park Plaza - Suite 225
324 South Hyde Park Avenue
Tampa, Florida 33606-4127
(813) 251-1210 | (813) 253-2006 – Fax
E-mail:  dstefany@anblaw.com
              mstefany@anblaw.com
              mmorrison@anblaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 2nd day of July 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to Andrew R. Frisch, Esquire (afrisch@forthepeople.com) and Chanelle J. Ventura, Esquire (CVentura@forthepeople.com) of Morgan & Morgan, P.A., 600 N. Pine Island Road, Suite 400, Plantation, Florida 33324.

*s/ David J. Stefany*
ATTORNEY